IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JOHN NORMAN RYAN,

                    Plaintiff,                          CV-10-626-ST

        v.                               OPINION AND ORDER

JOHN HARLAN, *et al*,

                        Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On June 3, 2010, plaintiff, John Ryan, appearing *pro se*, filed a Complaint alleging claims

under 42 USC § 1983 against a number of defendants for violations of the Fourth, Fifth and

Fourteenth Amendments arising out of three events:  (1) an allegedly unlawful arrest on

October 5, 2009, at Portland State University ("PSU"); (2) an assault on January 4, 2010, at PSU;

1 - OPINION AND ORDER

and (3) withholding his personal property in two rented PSU lockers.  The Complaint alleges that

all defendants acted in concert and collusion with one another under color of state law to:

(1) prevent Ryan from attending PSU and "accessing certain Federal entitlements;" (2) prosecute

him without due process of law; and (3) deprive him of housing.

On January 6, 2011, the PSU defendants (Michael Anderson, Angel James, Robert

McCleary, Renee Nylander, Michael Soto, Natalee Webb, and Wim Wiewel) filed a Motion for

Summary Judgment (docket # 71).  About a week later on January 14, 2011, the Multnomah

County defendants (John Harlan, Carl Goodman, and Kevin Bowers) also filed a Motion for

Summary Judgment (docket # 77).[1]  The court issued a Summary Judgment Advice Notice to

Ryan dated January 7, 2011(docket # 76).  Although Ryan has not filed any response to the

summary judgment motions, this court has considered some of his other submissions.  For the

reasons set forth below, summary judgment is granted to all PSU and Multnomah County

defendants.[2]

## **LEGAL STANDARDS**

### I.    **Summary Judgment**

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

---

[1]  This court previously granted Ryan's motion to withdraw his claim against the other Multnomah County defendant, Jeffrey Howes (docket #23).

[2]  The only other defendant, Catherine Magdalena, has been dismissed (docket # 89).

2 - OPINION AND ORDER

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id*.

## II.    § 1983

Section 1983 does not create any substantive rights but "is the vehicle whereby plaintiffs can challenge actions by governmental officials. To prove a case under section 1983, the plaintiff must demonstrate that (1) the action occurred 'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal statutory right." *Jones v. Williams*, 286 F3d 1159, 1162-63 (9th Cir 2002) (citations omitted).

///

///

///

///

3 - OPINION AND ORDER

## DISCUSSION

I.    **Multnomah County Defendants**

A.    **Claims**

The three Multnomah County defendants are John Harlan, a Multnomah County probation officer ("Harlan"), Carl Goodman, Assistant Director of the Multnomah County Adult Services Division ("Goodman"), and Kevin Bowers, Harlan's supervisor ("Bowers"). Complaint, ¶¶ 7-9.  Ryan alleges that Harlan "unlawfully and inappropriately" contacted the PSU Public Safety Office and several of its officers and requested that they "trespass" and "otherwise harass" him "for the purpose of causing him to lose and/or relinquish his status as an enrolled student at [PSU]." *Id*, ¶ 23.  He further alleges that Harlan "unlawfully and unconstitutionally" contacted Magdalena, the manager of a subsidized housing complex for the disabled, "for the unlawful purpose of prejudicing" her against him by making "untrue accusations" against him in order to harass him and be denied housing, and ultimately to "disenroll" him from PSU, thereby denying him "equal access to education." *Id*, ¶¶ 52-53.

B.    **Undisputed Facts**

In March 2007, Multnomah County Circuit Judge Kathleen Dailey issued a permanent stalking protective order ("SPO") against Ryan.  Harlan Decl., ¶ 6.  On September 11, 2007, a jury convicted Ryan of violating the SPO under ORS 163.750.  *Id*, ¶ 7, Ex.1.  As a result, Ryan was sentenced to three years of supervised probation with a mental health probation officer.  *Id*, ¶ 8, Ex.1.  As part of his probation, Ryan was required to fulfill the specific conditions of supervision imposed by Multnomah County Circuit Court Judge Youlee You and the general conditions of supervision set forth in ORS 137.540.  *Id*, ¶¶ 8-9, Exs. 1 & 2.

On May 5, 2009, while still on probation for violations of the SPO, Ryan was convicted of one count of Attempt to Resist Arrest and sentenced to one year probation for that offense. *Id*, ¶ 10, Ex. 3.

Harlan, a probation officer, was assigned to supervise Ryan during his term of probation. *Id*, ¶¶ 1- 2. Harlan began supervising Ryan on or about September 10, 2008, but has had no contact with him since February 2009. Id, ¶¶ 3, 17.

On August 13, 2009, when Ryan failed to report to him as required, Harlan requested the court to issue an arrest warrant for Ryan. *Id*, ¶ 11, Ex. 4. The court apparently issued that warrant. Harlan informed the PSU Public Safety Office of the outstanding warrant and requested that it inform him of any arrests, exclusions or complaints received regarding Ryan. *Id*, ¶ 13. On October 5, 2009, PSU Public Safety Officers arrested Ryan pursuant to the outstanding warrant for probation violations. *Id*, ¶ 12, Ex. 5.

On November 9, 2009, a probation violation hearing was held before Judge You. *Id*, ¶ 14, Ex. 6. Ryan was represented by counsel at the hearing. *Id*. Judge You found Ryan in violation of the terms of his probation for failing to report and sentenced him to 34 days in jail. *Id*. She continued the probation on violation of the SPO charge but terminated the probation on the Attempt to Resist Arrest charge. *Id*, ¶¶ 14-15, Exs. 6 & 7.

Harlan has never spoken with or contacted Magdalena or interfered in any way with Ryan's attempt to obtain housing at the Lyndon Mulsof Manor. *Id*, ¶ 16.

**C.    Harlan**

Based on the undisputed facts, there is no evidence that Harlan did anything unlawful in obtaining the arrest warrant. In fact, Ryan admitted in his deposition that he did fail to report to

Harlan as required, which resulted in the issuance of an arrest warrant and his subsequent arrest by the PSU Public Safety Officers pursuant to the warrant.  Calandriello Decl., ¶ 3, Ex. 8, pp. 2-3.  This is also confirmed by Judge You's subsequent finding that Ryan had violated the terms of his probation.

There is no evidence that Harlan harassed Ryan or asked the PSU Public Safety Officers to exclude him from PSU or otherwise acted with any other improper purpose.  Harlan denies Ryan's allegations, and Ryan has submitted no evidence from which a reasonable person could contest that denial.  Even if Harlan did act with some unlawful motive, the fact remains that Ryan was lawfully arrested pursuant to an arrest warrant, resulting in no constitutional violation.  Furthermore, due to the court hearing, Ryan received whatever procedural due process was required by the Fourteenth Amendment prior to being sanctioned for violating the terms of his probation.

With respect to Ryan's allegation that Harlan "unlawfully and unconstitutionally" contacted Magdalena, Ryan denies that he had any contact with Magdalena.  Ryan has not submitted any contrary evidence and, in fact, admitted in his deposition that Magdalena never represented to him that she had spoken with Harlan and that he has no personal knowledge of any contact between Harlan and Magdalena.  *Id*, ¶ 4, Ex. 8, pp. 4-8.  Instead, his claim is based on a perceived change in Magdalena's attitude towards him which he believes had to result from Harlan's communications with her.  *Id*, Ex. 8, pp. 7-8.  This unfounded supposition is not sufficient to create a factual issue for trial.

///

///

6 - OPINION AND ORDER

D.    **Goodman and Bowers**

Ryan has sued Goodman (Assistant Director, Multnomah County Community Justice Adult Services Division) and Bowers (Community Justice Supervisor) in their official capacities for allegedly failing to train and supervise Harlan "in the civil rights of citizens" and for "allowing, permitting, and encouraging the deprivation of [his] civil rights."  Complaint, ¶¶ 8-9, 19-21.

As long as the government entity receives notice and an opportunity to respond, a suit against a public official in his official capacity is, in all respects other than name, to be treated as a suit against the entity.  *Kentucky v. Graham*, 473 US 159, 165-66 (1985) (internal citations omitted).  To prevail in a § 1983 suit against a public entity, a plaintiff must plead and prove that the entity itself is a "moving force" behind the constitutional deprivation suffered by the plaintiff. *Polk County v. Dodson*, 454 US 312, 326 (1981), quoting *Monell v. Dept of Soc. Serv.*, 436 US 658 (1978).

Harlan took all alleged actions pursuant to his legitimate authority as Ryan's assigned probation officer, and, as explained above, none of those alleged actions rise to the level of a violation of Ryan's constitutional rights.  In the absence of any underlying constitutional violation by Harlan, Goodman and Bowers cannot be held liable in their official capacities.

E.    **Conclusion**

For the foregoing reasons, the Multnomah County defendants are entitled to summary judgment against Ryan's claims.

///

///

7 - OPINION AND ORDER

II.    **PSU Defendants**

A.    **Claims**

Ryan claims that the President of PSU (Wim Wiewel), two other administrators (Natalee Webb and Angel James), three Public Safety Officers (Robert McCleary, Michael Anderson, and Renee Nylander), and the Chief of Security (Michael Soto) denied his due process rights by preventing him from receiving financial aid so that he could attend courses, violated his equal protection rights, engaged in an improper search and seizure, and breached criminal statutes pertaining to computer fraud.

B.    **Undisputed Facts**

Ryan graduated with two undergraduate degrees from the University of Colorado in 1989. Abrams Aff., Ex. C.  He then became a post-baccalaureate part-time, non-degree student at PSU in the fall of 2007.  Abrams Aff, Ex. A ("Ryan Depo."), p. 51, & Ex. B.  From the fall of 2007 through the winter of 2010 at PSU, he completed four credit hours:  three in the Winter 2009 quarter and one in the Spring 2009 quarter.  Ryan Depo., p. 54; Abrams Aff., Ex. B.  Although he also took classes in the Fall 2007 quarter and Winter 2010 quarter, he failed to complete them. Abrams Aff., Ex. B.[3]

In the fall of 2007, Ryan submitted an application for a noncredit Extended Studies certificate.  Abrams Aff., Ex. D.  This certificate program does not qualify for financial aid or admission to PSU.  *Id*, Ex. E.  Ryan began to apply for financial aid through PSU, but did not complete the admission paperwork and therefore did not qualify for aid.  *Id*, Ex. F, p. 2.  In

[3]  Ryan states that he attended and passed a graduate mathematics course, Modern Analysis II, under the pass/fail option in the Winter 2008 term.  Ryan Aff. (docket # 84), ¶¶ 4, 12.  However, his official PSU transcript does not support this statement.

November 2007 when he discovered he would not receive financial aid for the term, he dropped out. *Id*. At that point, he owed PSU $3,700 for tuition. *Id.*

In January 2009, Ryan again tried to register for classes and apply for financial aid. He spoke with Jennifer Norton in the PSU financial aid office who agreed to provide him with financial aid for the Winter 2009 term and to pay off his $3,700 debt to PSU. *Id*. Ryan met with Jennifer Portis, the Director of the Multimedia Extended Studies program, who signed off on financial aid for one term only, provided that Ryan pay off his $3,700 debt to PSU first and not participate in group projects. *Id.* He completed three credit hours that term. *Id*, Ex. B.

Ryan again enrolled in classes for the Spring 2009 term. However, he attended only one class and received one credit. *Id*, Exs. B & G, p. 1. He attended no further classes until the Winter 2010 term. *Id*, Ex. B.

On October 5, 2009, when not enrolled in any classes, Ryan was on the PSU campus late at night and encountered PSU Safety Officer Michael Anderson. Soto Aff., Ex. H, p. 1; Ryan Depo., pp. 71-73. Officer Anderson asked Ryan for identification. Ryan Depo., pp. 73-74. He then checked with dispatch and determined that a warrant had been issued for Ryan's arrest. Soto Aff., Ex. H, p. 1. Ryan concedes there was an arrest warrant out for him. Ryan Depo., p. 74. Anderson then arrested Ryan. *Id*, pp. 73-74; Soto Aff., Ex. H, p. 2. PSU safety officers have the right to make arrests. Ryan Depo., p. 75; ORS 352.385. Anderson delivered Ryan to the Multnomah County jail. Ryan Depo, pp. 74-75; Soto Aff., Ex. H, p. 2. Ryan spent the next 39 days in jail. Ryan Depo., p. 81.

As a result of being on campus while having an outstanding arrest warrant, Ryan was issued a Criminal Trespass Warning stating that he could be arrested if found within the campus

boundaries and on campus property.   Soto Aff.,  Ex. H, p. 4.  This warning was amended on

January 19, 2010, to allow Ryan "to arrive and depart the campus when attending registered

classes."  *Id*, Ex. I; Ryan Aff. (docket # 84), ¶ 17.

On January 5, 2010, Ryan was in line at the PSU financial aid office.  Soto Aff., Ex. J,

p. 1; Ryan Depo., p. 83.  Officers Nylander and McCleary saw him there in violation of the

trespass warning and removed him from line.  Ryan Depo., p. 82; Soto Aff., Ex. J., p. 1.  Before

asking him to leave, they allowed him to go to the President's office where Ryan believed he

could find some assistance.  Ryan Depo., p. 84.  However, the person he sought, Angel James,

then assistant to the President, was not there.  *Id*. pp. 84-85.  When Ryan tried to gain admission

to the President's office to deliver a letter to an intern, Officer McCleary stopped him.  *Id*,

pp. 85-86.  After exiting and when walking between two buildings, Officer McCleary tackled

Ryan, restated that there was a trespass notice in place, handcuffed him, and placed him in a

holding cell.  *Id*, pp. 86-87.  He was held for at most 15 minutes, issued a citation for trespass,

then released on his own recognizance.  *Id*, p. 88; Soto Aff., Ex. J., p. 2.

During the 2009-10 school year, Ryan had rented two adjoining lockers through March

2010.  Soto Aff., ¶ 5; Ryan Aff. (docket # 84), ¶ 17(b) & Attachment 6.  After the rental expired,

he continued to store his possessions in the lockers which was not discovered until the regular

sweep of lockers between school years to clean them out prior to being re-rented.  Soto Aff., ¶ 5.

That Ryan had rented these two lockers was initially not known to campus security which does

not manage or oversee the lockers.  *Id*.  As soon as Michael Soto, PSU's Chief of Security,

learned about the lockers, he made efforts for Ryan to reclaim his property and was willing to

make an exception to the trespass order for this purpose, but Ryan refused to cooperate.  *Id*.

Ryan also failed to cooperate with later efforts by the Oregon Department of Justice to return his property. Abrams Aff., ¶ 3. Ultimately, Ryan admitted that he had neither the means to transport his property nor the place to put it, as he was transient. *Id.* PSU remains willing to deliver this property back to Ryan.

### C.     Qualified Immunity

The PSU defendants first assert that they are shielded from liability for damages based on qualified immunity. Even if an officer violated one of Ryan's constitutional rights, that officer may still be protected from liability pursuant to the doctrine of qualified immunity where the "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 US 800, 818 (1982). Until recently this required a rigid two-part inquiry, in which the court first assessed whether there was any constitutional violation at all, and then determined whether that constitutional right was "clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 US 194, 201-02 (2001). Recently, the Supreme Court replaced *Saucier's* "rigid order of battle" with a more flexible rule which permits courts to address whether a right was clearly established before, or in place of, concluding that right was violated. *Pearson v. Callahan*, 555 US 223, —, 129 S Ct 808, 818 (2009). Courts may still follow the two-step analysis where it is helpful.

For the reasons set forth below, the undisputed facts fail to reveal any violation of any of Ryan's constitutional rights.

### 1.     Search and Seizure Claim

Ryan contends that PSU is withholding his personal property that he kept in lockers on the PSU campus and that the mail stored in his locker was opened. Ryan Depo., pp. 19-20, 24.

11 - OPINION AND ORDER

Ryan accuses Soto of seizing his property and then covering up his seizure. He bases this accusation on Soto first denying that PSU had any of Ryan's belongings, but six months later admitting that it did after receiving Ryan's letter of notice and demand. *Id*, pp. 19-21; Ryan Aff. (docket # 84), ¶ 44 & Attachment 10. According to Soto, no one at PSU Campus Security even knew that Ryan had rented two lockers and, thus, at first erroneously informed Ryan that PSU was not in possession of any of his property. Soto Decl., ¶ 5. In July 2010, as soon as he learned about Ryan's two lockers, Soto made efforts for Ryan to reclaim his property. *Id*. Ryan confirms that the lockers were not associated with Campus Security or under Soto's control. Ryan Depo., pp. 22-23. Nevertheless, Ryan does not believe Soto because he saw an older man who "looked very much like Mr. Soto" at a PSU information desk on January 4 or 5, 2010, when he discussed his locker rentals, leading to the conclusion that Soto knew about the lockers. *Id*, p. 23. However, it was *not* Soto. Soto Aff., ¶ 6.

Ryan apparently contends that the seizure of his property continues. However, he admits that he has received numerous e-mail communications from counsel for PSU trying to return his property. Ryan Depo., p. 21. Ryan has neither the place to store them nor the means to retrieve them. *Id*; Abrams Aff., ¶ 4. Accordingly, there has been no seizure of Ryan's property.

As for the opening of his mail, Ryan has not seen the contents of his lockers since early 2010 and thus has no actual knowledge to support this claim. Ryan Depo., p. 24. Therefore, this claim is based on unfounded speculation.

### 2.    Due Process Claim

Ryan claims that his due process rights were violated because he requested a hearing to obtain an adjustment of his tuition bill, but was told his appeals were exhausted though he

believes he never filed an appeal.  *Id*, pp. 40-41.  However, Ryan did file an appeal for a refund

for the Spring 2009 music (MUS 261) and social media (ART 399) classes and partially

prevailed by receiving a tuition refund of 40% for the music class and 100% for the social media

class.  Abrams Aff., Ex. G, p. 1; Second Abrams Aff., Ex. K.  He also concedes that he had no

entitlement to any refund for classes for which he registered and was not prevented from timely

dropping.  Ryan Depo., p. 102.

Ryan also claims a violation of due process because Natalie Webb "was the only one that

would talk to me.  All other avenues of communication were shut down."  *Id*, p. 119.  But when

questioned further, he offered nothing but speculation that Webb had taken any action to "shut

down" any access to PSU's processes or procedures.  *Id*, pp. 119-21.

Even if he was denied due process, Ryan has no recognized due process interest in

graduate level education.  There is an established and significant property interest in universal

elementary and high school education due to mandated attendance by state laws.  *Goss v. Lopez*,

419 US 565, 572-74 (1975).  However, post-high school, when attendance is not mandated, the

property interest is less and less protected.  "Courts are split on the question of whether a

graduate level student has a constitutionally protected interest in completing his education."

*Jenkins v. Hutton,* 967 F Supp 277, 282 (SD Ohio 1997) (citations omitted).  In *Stretten v.*

*Wadesworth Veterans Hosp.,* 537 F2d 361, 367 (9th Cir 1976), the Ninth Circuit found a property

interest in a medical resident's continued education.  However, *Stretten* turned on property

interests in employment and not on property interests in education.  *Id.*  Because the medical

resident was promised employment for the duration of his residency and relied on the income, he

had a protected property right necessitating due process.  The court did not discuss the impact on

13 - OPINION AND ORDER

the medical resident's education.  Furthermore, after *Stretten*, this court specifically found "no

case holding that a student has a federally-protected due process, property or liberty interest in

continued enrollment in or graduation from a state university" and declined to so hold.

*Fernandez v. Rosenzweig*, Case No. 95-241-FR, 1996 WL 453046 at * 3 (D Or, Aug. 8, 1996).

As to financial aid, the Fourteenth Amendment only protects a legitimate claim of

entitlement that a person has already acquired in specific benefits.  *Bd. of Regents of State*

*Colleges v. Roth*, 408 US 564, 577 (1972).  Ryan does not have a property interest in financial

aid because he was not an eligible student and did not receive a continuing benefit.

The eligibility of federal student financial aid is defined in 20 USC § 1091(a)(2) as

requiring that "the student is presently enrolled at an institution" and "maintaining satisfactory

progress in the course of study the student is pursuing."  A student is "maintaining satisfactory

progress" if:

> (A) the institution at which the student is in attendance, reviews the
> progress of the student at the end of each academic year, or its
> equivalent, as determined by the institution, and
> (B) the student has a cumulative C average, or its equivalent or
> academic standing consistent with the requirements for graduation,
> as determined by the institution, at the end of the second such
> academic year.

20 USC § 1091(c)(1).

Under state law, to receive state aid as an undergraduate student, OAR 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

requires that the student be "enrolled or accepted for enrollment as at least a half-time

undergraduate student at an eligible institution."  In addition, PSU's policy states that a student

must be enrolled in six to twelve credits, maintain satisfactory progress, and show a 67%

completion rate to receive aid.  Abrams Aff., Ex. E.

14 - OPINION AND ORDER

Ryan never met the statutory eligibility requirements for student financial aid.  Although taking classes, he was not enrolled in a "course of study" or specific program as required by the financial aid statute.  *Id*, Exs. B & E.  At most, he was enrolled in a noncredit extended study program that does not qualify for financial aid.  *Id.*  Furthermore, he was aware of this requirement.  On October 10, 2007, in an email exchange, Portis informed him that "the only way to get financial aid at PSU is to be formally admitted to PSU and be taking a minimum of 6 credit hours per term."  *Id*, Ex. E.  Portis also explained that he did not meet that requirement.  *Id.*  Ryan responded that he understood the enrollment requirement and that it was "not possible" for him to meet it.  *Id*, Ex. D.  When Ryan did enroll in six credit hours in the Winter 2009 term, he did receive aid.  However, when he enrolled in fewer than six credits, he was foreclosed from the possibility of receiving aid.  Thus, Ryan cannot claim he has a property interest that was denied him when he objectively failed to meet the minimum requirements.

Although Ryan received financial aid in the past, he had no expectation that it would continue.  If a recipient of government benefits has a strong interest in maintaining them, then the benefits cannot be terminated without due process.  *Goldberg v. Kelly*, 397 US 254, 264-69 (1970) (government could not terminate welfare benefits without due process).  In contrast, a student has no property interest in an initial application for financial aid.   In *Waugh v. Conn. Student Loan Found.,* 966 F Supp 141, 144 (D Conn 1997),  the plaintiff claimed that the denial of his student loan application deprived him of his property rights without due process.  Contrasting this situation with *Goldberg*, the court found that the defendant:

> did not guarantee the student loans and then attempt to terminate
> plaintiff's benefits.  Rather, plaintiff's initial application to
> defendant for financial assistance was denied.  Plaintiff has failed

> to establish a property interest in receipt of the student loans and is
> not entitled to the protection of the due process clause.

*Id*.

Similarly, Ryan received financial aid for one semester on a contract that specifically

noted it was only for one term.  Unlike the situation in *Goldberg*, there was nothing continuous

about this one semester's worth of aid that would trigger a due process violation if terminated.

Ryan's application for student financial aid for the fall 2009 term was an initial

application that was deficient according to the federal, state, and PSU financial aid eligibility

requirements.  He had no recognized property interest in the termination of aid he never initially

received.  Thus, Ryan was neither qualified for nor entitled to due process because he did not

have a property interest in continuing financial aid.

### 3.    Equal Protection Claim

Ryan also alleges a violation of his Fourteenth Amendment equal protection rights and a

Fifth Amendment due process claim.  "The Due Process Clause of the Fifth Amendment assures

every person the equal protection of the laws, 'which is essentially a direction that all persons

similarly situated should be treated alike.'"  *Philips v. Perry*, 106 F3d 1420, 1424-25 (9th Cir

1997) (citation omitted).  The standards for analyzing equal protection claims under the Fifth and

Fourteenth Amendments are identical.  *Weinberger v. Wiesenfeld,* 420 US 636, 638 n2 (1975)

(citations omitted).

Ryan is a Caucasian, male American citizen.  Ryan Depo., p. 17.  Therefore, he does not

allege, nor can he, that he is a minority.  He does claim to suffer from multiple disabilities.  *Id*,

p. 15; Ryan Aff. (docket # 84), ¶¶ 78-81 & Attachment 14.  However, he has submitted no

evidence that any PSU defendant acted against him due to his purported disabilities.  Ryan

Depo., p. 19.

The Fourteenth Amendment "requires that all persons subject to . . . legislation shall be

treated alike, under like circumstances and conditions both in the privileges conferred and in

liabilities imposed." *Engquist v. Or. Dept. of Agric.*, 553 US 591, 602 (2008), quoting *Hayes v.

Missouri*, 120 US 68, 71-72 (1887).  An equal protection claim focuses on governmental

classifications that affect groups of citizens differently than other groups based on characteristics

such as race, gender or national origin.  *Id* at 601.  A plaintiff must demonstrate that a defendant

acted with an intent or purpose to discriminate against him based upon membership in a

protected class.  *Washington v. Davis*, 426 US 229, 239-40 (1976).

Ryan appears to base his equal protection claim not on membership in a protected class,

but on the assertion that he was denied an education which other students in similar situations

were granted.  However, he does not and cannot allege that the PSU defendants acted with any

discriminatory intent or purpose based upon his membership in a protected class or show how he

was treated differently as a member of that class compared to others in similar situations.  Thus,

he cannot state a claim under § 1983 for the violation of the equal protection clause.  *Barren v.

Harrington*, 152 F3d 1193, 1194 (9th Cir 1998).

Ryan must identify an actual class of arguably indistinguishable persons who have been

treated differently.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 US 1, 60 (1983).  A plaintiff

may assert a "class of one" equal protection for "some forms of state action . . . which by their

nature involve discretionary decision-making based on a vast array of subjective, individualized

assessments." *Engquist,* 553 US at 603 (rejecting a "class of one" equal protection claim in the

17 - OPINION AND ORDER

public employment context).  Denying an applicant financial aid for not meeting established criteria and failing to assist a student to secure housing are not the types of "individualized assessments" that support a "class of one" theory based on an improper government classification.  Thus, Ryan may not avail himself of the "class of one" theory and does not belong to any class recognized for protection under the Fourteenth Amendment.

### D.    <u>Statutory Claims</u>

Ryan also alleges the PSU defendants violated several federal statutes, including 18 USC § 241 which prohibits conspiracies against an individual's constitutional rights.  However, this is a criminal statute.  Private rights to enforce federal statutes are found only when "the statute manifests an intent ' to create not just a private *right* but also a private *remedy.*'"  *Gonzaga Univ. v. Doe*, 536 US 273, 283 (2002), quoting *Alexander v. Sandoval*, 532 US 275, 286 (2001) (emphasis in original).  There is no indication that Congress intended to create a private right of action for violation of this criminal statute.  *Cok v. Cosentino*, 876 F2d 1, 2 (1st Cir 1989); *Newcomb v. Ingle*¸ 827 F2d 675, 677 n1 (10th Cir 1987).

Ryan also alleges a violation of 18 USC § 242 which relates to violations of a person's federal constitutional rights based on alienage, race or color.  Nowhere does Ryan allege that his alienage, race, or color affected any of the actions by the PSU defendants.  Furthermore, as with 18 USC § 241, this statute provides only criminal remedies.  Therefore, Ryan has no claim under either 18 USC § 241 or 18 USC § 242.

Ryan alleges that Soto infected his computer with a virus that "disables the spelling check feature in Microsoft Word" and thereby violated "18 USC § 1030 prohibiting knowing distribution of software harmful to a business entity involving interstate commerce."  Complaint,

18 - OPINION AND ORDER

¶ 39.  Much of this statute involves a criminal charge against persons who interfere with United

States Government computers.  Thus, this court presumes, as do the PSU defendants, that Ryan

is referring to 18 USC § 1030(a)(5)(A) which punishes a person who "knowingly causes the

transmission of a program, information, code, or command, and as a result of such conduct,

intentionally causes damage without authorization, to a protected computer."  A "protected

computer" is defined at 18 USC § 1030(e)(2)(B) as a computer "which is used in or affecting

interstate or foreign commerce or communication, including a computer located outside the

United States that is used in a manner that affects interstate or foreign commerce or

communication of the United States."

    The primary problem with this claim is the lack of evidence that Soto did anything to

Ryan's computer.  Soto denies taking this alleged action, let alone having the expertise to do so.

Soto Aff., ¶ 7.  To support his accusation, Ryan offers nothing more than speculation.  He has no

training that qualifies him to make that assertion.  Ryan Depo., pp. 58-59.  Moreover, neither of

his two computers was actually infected by the alleged virus.  *Id*, p. 58.

    In addition, as with 18 USC §§ 241 and 242, 18 USC § 1030 is primarily a criminal

statute.  It does, however, recognize a private right of action by "any person who suffers damages

or loss" to recover for five violations listed in 18 USC § 1030(c)(4)(a)(i)(I)-(V).[4]  18 USC

---

[4]  These five rights to recovery are:
**(I)** loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;
**(II)** the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
**(III)** physical injury to any person;
**(IV)** a threat to public health or safety;
**(V)** damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; . . . .

§ 1030(g).  Only the first of these violations (requiring proof of damages in excess of $5,000.00) is even marginally relevant to this case.  However, there is no evidence that Ryan has actually run a business, such that he would have suffered any recoverable damages.   Accordingly, Ryan has no claim pursuant to this statute.

     **E.**     **Supervisory Liability**

Ryan alleges that PSU President Wiewel failed to train and supervise and implement training programs for PSU security officers which resulted in the deprivation of his "rights."  Complaint ¶ 14.   Ryan admits that he brought this claim against President Wiewel because he was "supervisor to his employees."  Ryan Depo., p. 90.  However, that is an insufficient basis to prove a claim for constitutional violations.

"It is well established that section 1983 does not impose liability upon state officials for the acts of their subordinates under a *respondeat superior* theory of liability."  *Rise v. Oregon*, 59 F3d 1556, 1563 (9th Cir 1995), citing *Monell v. Dep't of Soc. Servs*., 436 US 658, 691-94 (1978).  Instead, "state officials are subject to suit under section 1983 only if 'they play an affirmative part in the alleged deprivation of constitutional rights.'" *Id*, quoting *King v. Atiyeh*, 814 F2d 565, 568 (9th Cir 1987).  A plaintiff must demonstrate that a supervisor "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F2d 1040, 1045 (9th Cir 1989) (citation omitted).  Ryan has submitted no evidence that President Wiewel played any such affirmative role.  Thus, his § 1983 claim against President Wiewel fails.

The Complaint also mentions Angel James as someone for whom Ryan had a letter, to whom he had spoken on several occasions, and who was not at her desk when he came by.

20 - OPINION AND ORDER

Complaint, ¶¶ 30, 32.  However, he admitted in his deposition that he sued her only because she had some supervisory authority.  Ryan Depo., pp. 90-92.  Due to the lack of any evidence that she participated in or directed any constitutional violations, any § 1983 claims against James fails.

Ryan also alleges that Webb refused to meet with him and, prior to allowing him to register for classes, insisted that he provide proof that the criminal charges against him had been dropped.  Complaint ¶¶ 45, 48.  Nothing in this alleged conduct rises to the level of a constitutional violation.  Besides, Ryan admits that Webb met with him.  Ryan Depo., pp. 107-09.  Therefore, Ryan has no viable claim against Webb.

### F.    Conclusion

Because Ryan has not submitted sufficient evidence to create a genuine issue of material facts as to any unlawful search and seizure, denial of due process, or denial of equal protection, the PSU defendants are entitled to qualified immunity as to those constitutional claims.  In addition, Ryan cannot state any viable claim for violation of 18 USC §§ 241, 242 or 1030 by any PSU defendant.  Finally, he has not submitted sufficient evidence to create a genuine issue of material fact as to any § 1983 claim against Wiewel, James or Webb.

### ORDER

For the reasons set forth above, the PSU and Multnomah County defendants' summary judgment motions (dockets # 71 and # 77) are GRANTED.

DATED this 22nd day of February, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

21 - OPINION AND ORDER